## OKLAHOMA, K. & M. R. CO. v. DANIEL.

No. 11296—Opinion Filed June 12, 1923.

Rehearing Denied July 17, 1923.

**1. Railroads—Operation—Frightening Animals.**

A railroad company is not liable for injuries caused by horses upon a street or other premises near a railroad track becoming frightened at the ordinary appearance of a train or cars under careful management.

**2. Negligence—Elements in General.**

To constitute actionable negligence, where the wrong is not willful or intentional, three essential elements are necessary: (1) The existence of a duty on the part of the defendant to protect the plaintiff from injury; (2) failure of the defendant to perform that duty; and (3) injury to the plaintiff proximately resulting from such failure.

**3. Railroads — Frightening Animals With Whistle—Negligence—Failure of Proof.**

Where the plaintiff, in an action for damages against a railroad company, alleges in his petition that the blowing of the whistle, that frightened the horse of plaintiff and caused him to throw plaintiff to the ground and injure him, was done willfully, negligently, and wantonly and without regard to the safety of plaintiff; and case is tried on the theory that it was willfully and wantonly done, but after the trial and appeal to this court, counsel for plaintiff states in his brief that he has abandoned the theory that the blowing of the whistle was willfully and wantonly done and is relying solely on the theory of negligence, held, that the case will be tried solely on the theory of negligence, and after the proof fails to show that the whistle was blown negligently the case will be reversed.

**4. Same.**

In this case, the record shows that the plaintiff was standing near a gate, inside of his own premises and off the right of way of defendant, when the motor car approached; and that the horse of plaintiff was very gentle—used to trains and was not at all

frightened until after the whistle was sounded, and then took fright at the sound of the whistle and jerked plaintiff to the ground and injured him. And the evidence further shows that the motorman did not see plaintiff or his horse at the time he sounded the whistle and did not see them afterwards. Held, that the evidence is insufficient to create liability against the railroad company.

(Syllabus by Maxey, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Ottawa County; N. C. Barry, Special Judge.

Action by W. P. Daniel against the Oklahoma, Kansas & Missouri Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded for new trial.

This is an action by W. P. Daniel, defendant in error, and plaintiff in the trial court, against the Oklahoma, Kansas & Missouri Railway Company, a corporation, plaintiff in error, and defendant in the court below. We will refer to the parties as they appeared in the trial court. The plaintiff sues to recover damages which he alleged were caused by the defendant's employe blowing a whistle to scare or frighten plaintiff's horse and causing it to jerk the plaintiff down and injure him. That part of the plaintiff's petition that states his cause of action is as follows:

"Plaintiff further alleges that in the forenoon of, on or about the 21st day of May, 1916, he drove a few head of his cattle from that portion of his land on the east side of defendant's right of way and railroad tracks, through the gates and over the crossing hereinbefore described, to that portion of his land lying on the west side thereof, at which time plaintiff was riding a horse. That after turning said cattle into said field plaintiff returned across defendant's right of way and railroad tracks to that portion of his farm on the east side thereof, during which time he was walking and leading his said horse. That after plaintiff had thus entered upon his own land on the east side of defendant's right of way and tracks, and had closed the gate in the right of way fence and had started to walk eastward, away from defendant's right of way and railroad tracks, leading his said horse, holding the halter on his said horse with his right hand, the end of the rope attached to the halter on said horse with his left hand, the motor car, owned and operated by the defendant along and over said right of way and railroad tracks, passed over said private road or crossing, traveling south. That as said motor car was passing over said private road or crossing the motorman in charge and control of the said motor car,

and was employed by said defendant for the purpose of operating said motor car, did, wantonly, negligently, willfully, and without regard to the safety of this plaintiff cause one sharp blast of the whistle of said motor car to be blown.

"That on account of the sudden, harsh and unexpected noise, occasioned by the blowing of said whistle, the said horse, which plaintiff was leading in the manner hereinbefore described, become so frightened that it made a lunge and ran away, jerking this plaintiff a distance of 20 feet or more; said plaintiff falling hard on the ground, lighting on his left hip and shoulder." (C-M., pages 4 and 5.)

The defendant joined issue on this petition by filing answer in the nature of a general denial. The case was afterwards tried before Hon. N. C. Barry, special judge, and a jury. The evidence introduced, on the part of the plaintiff, was to the effect that on the 21st day of May, 1916, he was living on his farm in Ottawa county, Okla., and that the defendant railway ran through his farm, north and south, leaving about 15 acres on the east side of defendant railway. The railway right of way was fenced through the farm and there was a private crossing on the railway between plaintiff's east farm and west farm; that about nine o'clock in the morning of said day, plaintiff crossed the private crossing of defendant company to the west pasture driving some cattle across. He opened the gate to the crossing, and drove the cattle across to the west side and closed the gate on that side, and went back, leading his horse, to the east side, and passed out of the gate with his horse, and closed the gate on the east side. About this time a motor car, which was being operated on defendant's railway, was seen some distance away, going south. Plaintiff was tying the gate and standing with the horse between him and the approaching motor car; the horse with his head over the gate looking west. The car came on down the road south, and when it got to this private crossing the motorman sounded a blast of the whistle which frightened plaintiff's horse and caused his to jump, and in so doing he jerked the rope in the hand of plaintiff and threw plaintiff to the ground, plaintiff lighting on his left hip and shoulder and injuring himself. That part of the testimony of plaintiff detailing how the accident occurred is as follows:

"Q. What did you do when you got over to the gates? A. Got off and opened both gates and drove my cows through into the west pasture, and led my horse behind the cows, and I shut the gate on the west side and come back to the east pasture, got in the

pasture and closed the gate, and the regular fastener was broke, and I tied it with a rope and the motor car run in so close—I didn't have time to finish tying the rope, and the horse's head was turned toward the southwest, over the gate. I taken hold of the halter next to her head with my left hand, and when they got even with me, I'd say within twelve feet of the mare's head, and right on the crossing—the front part of the car may have been a few feet over the south side of the crossing—then they give a keen blast of the whistle—that scared the mare and she whirled and knocked me loose from my right hand, she made another lunge and that throwed me in the neighborhood of 20 or 25 feet, and I lit on my left hip and left shoulder. The mare ran off, as near as I could judge without measuring it, 50 or 75 yards and stopped perfectly quiet; and she didn't care any more for a car than she did a wagon. I freighted with her here in Miami and I'd leave her stand right by the engine, and she didn't pay any attention to it."

Plaintiff further testified that the horse he was leading was gentle and used to trains; that he saw the car coming from the north some 25 or 30 rods away from him; that from where plaintiff stood, and in the direction the car was then going, there was another crossing about 100 rods away.

Plaintiff stated that he was 67 years old, and for several years prior to his injury, for which this action is brought, had suffered with rheumatism or some trouble with the sciatic nerves, but that he had not been bothered with this to any great extent for some time prior to this accident. He further stated that he had freighted from the depot at Miami with the horse, and that she wasn't a bit afraid of trains—wasn't afraid of an engine, but that it was the keen blast of the whistle that frightened her. He stated that he did not know the rules and regulations of the railroad about blowing the whistle; but that it seemed to him that it was blown for self-amusement. In answer to the question, "What makes you think, Mr. Daniel, that it was done maliciously, and wantonly, and willfully for the purpose of scaring your horse?" he said:

"A. Well, the reason I think it was, they couldn't help but seeing me cross the track, couldn't help but seeing the horse standing there; they were right within less than 12 feet of the mare when they blew that whistle; there was a clear track and nothing to bother them; no reason I could see for blowing that whistle, only for self-amusement, not to cripple me. but it did it just the same."

And again at page 29 of the case-made plaintiff says:

"Q. You have alleged here, and this case is brought on the theory that it was done for that purpose? A. Not for the purpose of crippling me. I don't think that, Mr. Bessey. I don't think that a man would be that cruel-hearted. I think it was self-amusement and I don't think he thought about crippling me, but it crippled me just the same."

Archie Daniel, son of the plaintiff, testified that he heard the whistle blow, being just one blast, and that the horse his father was leading was gentle and not afraid of trains, and that he did not see anything on defendant's track for which a whistle might have been blown; that the car did not stop at the nearest crossing south of the point of the accident. He was some distance away—about 200 yards. The defendant's testimony was that C. B. Collins was the motorman in charge of the car in question. and his testimony shows that he did not see the plaintiff either before the injury or afterwards, nor did he see the horse at the side of the crossing where the injury occurred; that the whistle on the car in question could not be blown so as to show different tones of shrillness or loudness; that witness had been in the railroad business for 26 years, and that the system of signalling on this motor car was practically the same as that used on steam railroads; that he did not know whether he sounded the whistle for any purpose on the private crossing connecting the farms of plaintiff on the day in question, but that if he did, it was sounded in response to a signal from the conductor. He denies that he wantonly, willfully, and maliciously blew the whistle for the purpose of scaring plaintiff's horse. Witness explained the different signals that were given along the railroad when operating the car, and explained the signals that passed between conductor and motorman. It seems that the conductor used an air whistle to communicate with the motorman, and the motorman used the whistle on the car that was used for all signals in answering conductors. G. W. Rice, superintendent of the defendant railway company, also testified in regard to the kind of signals used in operating the motor car, but did not know anything about the accident. This in substance was the testimony bearing on the accident from which the plaintiff received his injury.

At the close of the testimony, the court instructed the jury; and after argument of counsel, the jury retired, and after deliberating returned a verdict in favor of the plaintiff for $2,100. Motion for new trial was made by defendant railroad, but overruled by the court and the case appealed to this court.

Ray McNaughton, for plaintiff in error.

Frank Nesbitt, for defendant in error.

Opinion by MAXEY, C. The defendant in error, plaintiff below, in his petition seeks to recover on a dual theory. In the third paragraph of his petition, he alleges:

"That the motorman in charge and control of said motor car, and employed by the said defendant for the purpose of operating said motor car, did, wantonly, negligently, and willfully, and without regard to the safety of plaintiff, cause one sharp blast of the whistle to be blown which frightened plaintiff's horse, making it lunge and run away, jerking plaintiff down and causing him to fall on his left hip and shoulder."

In the fifth paragraph of his petition plaintiff alleges:

"That said fall which he suffered was a direct and proximate result of the negligent blowing of the whistle and that as a result of said fall, his left hip and shoulder was severely bruised and injured."

It will be seen that plaintiff is relying on the two theories of "wantonly, negligently and willfully," and on the theory that it was "a negligent blowing of the whistle that frightened the horse and caused him to throw and injure him." It occurs to us that plaintiff, in his petition, laid great stress on the allegations that the blowing of the whistle was wantonly and willfully done, but when the plaintiff was on the witness stand he put it in this way—that he thought it was done for self-amusement. He was cross-examined later fully on why he had charged that it was willfully and wantonly done, and his answer was that he did not mean by that, that they intended to cripple him, but they did just the same; that his idea was that they blew the whistle for self-amusement. The defendant in error now states in his brief that he did not rely on it being done wantonly and willfully, but relied solely on the theory that it was negligence to blow the whistle at the time and place it was blown, and states that plaintiff in error, in its brief, was wrong, and in commenting on the fact that he had alleged a wanton and willful blowing of the whistle, but had failed to make any proof to substantiate that allegation, says that he had abandoned the wanton and willful theory, and was relying solely on it being negligence, and says that the defendant below should have made a motion to require him to elect which theory he would proceed on. We can hardly agree with the proposition that the defendant below should have filed a motion to require him to elect, but are rather inclined to think that the plaintiff,

when he decided to abandon his theory of "wantonly and willfully," should have advised the court and counsel for defendant that he did not rely on that theory, but relied solely on the theory of negligence. Counsel would have then been advised, and so would the court, and it would have avoided the necessity of arguing that theory or having the court instruct on that theory.

There is a total failure of proof to sustain the allegations that the blowing of the whistle was wantonly and willfully done, and counsel for defendant in error says in his brief, on page 20:

"After reading this evidence over several times, we failed to see anything in it that savors of willfulness or wantonness."

And again, on page 21 of his brief, counsel says:

"Consequently it seems that after a fair consideration of the evidence, it cannot be said there is any testimony in the whole record that in any way or manner tends to support the theory of wantonness and willfulness."

So it will be seen that counsel for plaintiff now says that he is not standing on the theory that the injury was caused by the wanton, negligent, and willful blowing of the whistle, but wholly on the ground of negligence. Yet the court, in its instructions to the jury (No. 1, which is a statement of the case), quotes that part of the petition which alleges wantonness, willfulness, and negligence, and without regard to the safety of the plaintiff; and again in its instruction No. 10, the court quotes from the petition, and again repeats that plaintiff alleges that the injury was the result of wantonly, negligently, and willfully, and without regard to the safety of the plaintiff, causing one sharp blast of the whistle of said motor to be blown, so that it will be seen that the allegation of the whistle being blown wantonly, willfully, and negligently is carried to the jury through the instructions of the court, without any notice from the plaintiff that he had abandoned that theory of the case, or any objection on the part of the defendant's counsel, but counsel for defendant may have relied on the proposition that the court was committing an error in submitting it on that theory, and that he could take advantage of it on a motion for a new trial or appeal. However that may be, we now have the plaintiff in error arguing the case on the dual theory, and counsel for defendant in error contending that he had abandoned the wanton and willful theory, and was standing alone on the theory of negligence.

We will, therefore, agree with counsel for defendant in error that there is absolutely no testimony that would sustain the theory that the blowing of the whistle was willfully and wantonly done, and confine ourselves to the testimony on the question of negligence to see whether there is sufficient testimony on that theory to hold the defendant railroad company liable.

Let us get the plaintiff's location with reference to the railroad track clearly in our mind. Plaintiff had driven some cows to the private crossing on his farm, and had opened both gates and driven the cows through into the west pasture, leading his horse behind him; and after driving the cows into the west pasture, he closed the gate to that pasture and walked back across the railroad track, leading his horse, and went through the gate on the east side, and closed the gate, and was tying it with a rope when he saw the motor car approaching. The horse was standing with his head over the gate and was between Daniel, the plaintiff, and the approaching car. Daniel had stopped his work of tying the gate and was standing there by his horse with his right hand on the head piece of the halter and holding his left hand near the end of the rope, which was used for the rein. The horse was not at all frightened until the blast of the whistle frightened him. This blast of the whistle was given just after the car had passed where Daniel and his horse were standing. The motorman says that he did not see Daniel or the horse, and there was nothing to attract his attention to them. He was naturally looking down the railroad track, as was his duty to do, and did not observe Daniel and his horse standing at the gate as he passed, and did not see them after the horse became frightened at the whistle and jerked Daniel down and injured him. The evidence was that the horse was used to trains and showed no sign of fright at trains or engines. The plaintiff, Daniel, was off of the right of way on his own premises, and was not in any apparent danger, and there was nothing to call the motorman's attention to anything that would endanger the plaintiff. Even if he had been looking at him, he would not have discovered anything that would have led him to believe that the plaintiff was in danger of being injured. Counsel for defendant in error insists that it was the motorman's duty to have seen Daniel because the motorman said that he should have seen them, but did not, as he was evidently looking down the track, and not off to one side where Daniel and his horse were standing. It is a well-settled principle of law that it is the duty of those

operating a train to keep a lookout for persons in or near the track, and, when discovered, to use all reasonable means to prevent injuring them. But what is there here to call for the exercise of this duty? Daniel and his horse were outside of the right of way of the defendant railroad and on Daniel's premises; and there was nothing to attract the motorman to them as he was passing. The horse was perfectly quiet. Daniel was standing with the horse between him and the approaching motor, so that the motorman could not have seen him if he had been looking, although he might have seen the horse. It is very different from a case where the engineer or motorman sees a man with his horse apparently frightened and running, or attempting to run, and the person with him attempting to control him, and prevent him from running off. In such case, it would be the duty of the engineer or motorman to refrain from making an unusual noise that would frighten the horse any more than he was already frightened; but in this case, we have no frightened horse, and evidently Mr. Daniel wasn't the least bit disturbed about the horse getting frightened, as he stated more than once in his testimony that the horse was used to trains as he had freighted with her from Miami, and driven her right up by the trains and the engines, and that it never frightened the horse in the least. This court has laid down the rule covering actionable negligence in a number of cases. In the case of M.. K. & T. Ry. Co. v. Wolf, 76 Okla. 195, 184 Pac. 765, this court laid down the following elements to constitute actionable negligence: Where the wrong is not willful and intentional, three essential elements are necessary: (1) The existence of a duty on the part of the defendant to protect the plaintiff from injury; (2) failure of defendant to perform that duty; and (3) injury to the plaintiff proximately resulting from such failure. This rule was reiterated in Lusk et al. v. Wilkes, 70 Oklahoma, 172 Pac. 929, and in Chicago, R. I. & P. Ry. Co. v. Zirkle, 76 Okla. 298, 185 Pac. 329. These three cases, all being recent cases, are sufficient to estabish the rule in this jurisdiction. Now let us see if we can apply this rule to the case under consideration. What duty did the defendant railroad owe the plaintiff at the time his horse was frightened and he was injured? Take the plaintiff Daniel's testimony detailing the situation. He was outside of the right of way, on his own premises, with a horse that was perfectly gentle and accustomed to being about trains, and that had never become frightened at the movement or the noise of trains. Daniel was evidently feeling per-

fectly secure, knowing that his horse did not get frightened at trains, and was standing by the gate with the horse, evidently with no thought in his mind that the horse would become frightened. What was there to call the attention of the motorman to any immediate danger of the horse becoming frightened and knocking him down and injuring him? Certainly nothing up to the time that the whistle was sounded, and the car had passed where he was standing so that the motorman did not see Daniel or his horse at the time the whistle was sounded, and the motorman did not see the horse or Daniel after the whistle was sounded and the horse became frightened, so that in our judgment there was no situation either before or after the sound of the whistle that called for any exercise on the part of the railroad company of any duty enjoined upon it. In the case of St. L. & S. R. Ry. Co. v. Boush, 68 Okla. 301, 174 Pac. 1036, Boush and his daughter, and a man by the name of McIntire, were driving a cart along a private road in the pasture and off the right of way. According to the testimony of McIntire, witness for plaintiff, while the horse was traveling at a slow pace, and the cart was about 50 yards from the railroad track, and the engine was at a point near the barn a little west of the private crossing, the whistle was sounded, the horse commenced to run, and Boush was thrown out; that the whistle had a jerky sound, which continued from the time the horse commenced to run until Boush was thrown out. It was further shown in this case that the fireman and the head brakeman were on the side of the engine nearest to where Boush was driving when his horse ran away, but that the engineer, who had control of, and was operating, the train, was on the other side and could not see, and did not see, Boush at the time the horse ran away and he was injured. The court, in the body of its opinion in this case, says:

"Tested by this rule, the evidence is sufficient to warrant the conclusion that the horse was frightened and caused to run away by the sound of the whistle of the locomotive, in consequence of which the plaintiff's decedent sustained injuries. And there is evidence that two men on the left hand or south side of the engine were aware of the effect the sounding of the whistle was having on the horse, and since the defendant Weber was fireman and his station was on that side, and he admits seeing the parties immediately after the accident, the inference is reasonable that he was one of the two men. He testified that he did not sound the whistle. There is not only no direct evidence contradicting him, but no evidence from which the inference may reasonably be drawn that he did. The uncontradicted evidence is that the whistle could not be manipulated or controlled from the fireman's side, but only from the engineer's side, where the defendant Nichols was stationed. From the evidence of the plaintiff and the uncontradicted evidence of the defendant, no other reasonable inference can be drawn than that the whistle was sounded by the engineer, Nichols, and not the fireman, Weber. It is quite clear that the motion of the defendant Weber for a directed verdict in his favor should have been sustained. As to the other defendants, it seems to be conceded that if the defendant Nichols is liable, the railway company is also. But was the evidence sufficient to support a verdict against Nichols? We think not. The evidence does tend to show that he sounded the whistle which frightened the animal. But there is no evidence that he sounded it with the purpose and intent of frightening the horse, or that he saw or knew the effect thereof, or that his act was willful, wanton, or malicious. He testified that he did not see them, and did not know the parties were in the vicinity, or that an accident had happened, until some time afterward. Under the circumstances, it was not his duty to keep a lookout for persons in the vicinity of the tracks. C., R. I. & P. ʀy. Hine, 59 Okla. 143, 158 Pac. 597. If this testimony is true, it cannot be said that his act was willful, wanton, or malicious, or done with the intention to frighten the animal. There is no direct evidence that he did see the vehicle and its occupants, or that he knew the effect sounding the whistle would have, or was having on the horse. In view of the uncontradicted evidence as to the situation of the devices for manipulating the whistle, it is not reasonable to infer that either of the two men seen by plaintiff's witnesses on the south side of the locomotive, whether both were at the window, or one at the window and the other in the gangway, looking at the runaway and laughing while the whistle was being sounded, was the engineer, Nichols. It was not possible to reach the whistle cord from their position. Besides, neither of the witnesses for plaintiff, though they observed these men closely enough to remark the expression of their countenances, testified to observing any movement indicating that they were sounding the whistle. While for the purpose of the motion it must be assumed that there were two men looking out from the south side of the cab, it does not follow that one of them was the engineer. The position of the head brakeman at the time was not otherwise accounted for, and the only reasonable inference to be drawn from the fact that there were two men on that side, in view of other uncontradicted evidence, is that one was the fireman and the other this brakeman. It was not possible, on account of the boiler

projecting into the cab, for the engineer, at his station on the north side of the cab, to see the horse and the occupants of the vehicle on the south side of the track during or immediately before the locomotive reached the private crossing, after which, according to all the evidence on the point, the horse became frightened. We are clearly of the opinion that there is not sufficient evidence reasonably tending to support the allegation of the petition that the injury was willfully, wantonly, intentionally, or maliciously inflicted."

It will be seen from this quotation that the situation of the engineer, who was in control of the running of the train and the blowing of the whistle, was on the opposite side from the parties who were in the cart, and he did not, and could not, see them, and knew nothing about the horse being frightened. The suit was brought against the railroad company, and against the engineer Nichols and the fireman Weber, and the court directed a verdict in favor of Nichols and Weber, and this was sustained by this court; and the case was reversed and remanded for a new trial as to the railroad company. It would be hard to find a case where the situation of the parties and the surroundings were as near like that case as this case. In both cases, the engineer in the first case, and the motorman in the other, did not see the parties injured, and did not know of the injury until some time afterwards. In the Boush Case, the court directed a verdict as to Nichols and Weber, the engineer and the fireman, and reversed the case as to the railroad company, and remanded it for a new trial. We think these authorities are sufficient to justify reversal of this case if nothing else, but there are other reasons disclosed by the record that we think add to the reasons why this case should be reversed, which we will notice hereafter.

Counsel for defendant in error admits that the motorman never saw Daniel and his horse at the time he blew the whistle, but says he could have seen him if he had been looking, and therefore draws the conclusion that it was negligence on the part of the motorman that he did not see Daniel. While the law imposes the duty on the motorman to keep a lookout ahead and along the highways, that does not mean that he shall be looking along the highway and over in the fields and in the fence corners for somebody, or stock of some kind, that might become frightened at the train and injure themselves. We have already called attention to the case of St. L. & S. F. Ry. Co. v. Boush, 68 Okla. 301, 174 Pac. 1036, and the

case of C., R. I. & P. Ry. Co. v. Hines, and other cases bearing on the subject under consideration. In the case of Engelsen v. Spokane P. & S. Ry. Co. (Wash.) 139 Pac. 599, the Supreme Court of Washington, in a similar case to this, says:

"There was no direct evidence that the engineer saw the plaintiff prior to the time or while her horse was running away. At the time her horse started to run, she was some distance in advance of the train. She was from 8 to 11 feet below the grade upon which the train was running. And, while some of her witnesses testified that there was nothing to prevent the engineer from seeing her, we are satisfied that even though it might have been found from the evidence that the engineer saw her, or might have seen her before he blew the whistle, negligence cannot be attributed to him. Because, if he had seen her, it would have been proper for him to have blown the whistle so as to warn her of the approach of the train. Unless there was evidence sufficient to show that the engineer was negligent in blowing the whistle, there was no case to be submitted to the jury. It is not claimed upon the evidence that the horse which the plaintiff was driving was frightened or became unmanageable before the blowing of the whistle. But the evidence tends to show that the blowing of the whistle was the cause of the horse becoming frightened. The engineer, therefore, was not aware, and could not have been aware, of the plaintiff's predicament until after the whistle was blown. The blowing of the whistle, therefore, could not be held to have been willful or negligent, unless it may be said that the blowing of the whistle prior to crossing a railroad bridge or before coming to a point where travelers may be upon a highway, in close proximity to a railroad, may be said to be negligence as a matter of law. We are satisfied that no such rule has been held in any case.

"We think the court might properly have taken the case from the jury upon the plaintiff's evidence. But when it was shown by the defendant's evidence that the engineer did not see the plaintiff, and, as a matter of fact, did not know of her proximity to the railroad, or know of the fact that her horse was frightened; and the further fact that it was customary to blow the whistle before crossing a bridge upon which persons might be employed. or at points where section men were liable to be, made it imperative upon the court to hold that there was no negligence in fact shown."

"It is contended in this case that the motorman had no occasion to blow the whistle at the place that it was blown."

How are we to know when it was necessary to blow or not blow a whistle of a train that is traveling at the rate, as coun-

sel for defendant has said in his brief, of perhaps 60 miles an hour? There is no contention that the speed of the train had anything to do with the injury but it evidently had a great deal to do with the motorman in keeping a lookout under such circumstances, and it was his duty to keep his eye straight ahead and watch the track and the right of way, and see that there was no person or stock on the right of way or on the track that was likely to be injured, and he had no time to be looking off the right of way for any stock that might be in the adjacent fields, or persons who might be traveling along the highway of the right of way, but near the railroad. He owed them no duty except, if he discovered that their horse was frightened, to not do anything that would add to the fright of the horse, and there is nothing of that kind in this case. The horse in question in this case was standing quietly at the gate of the private crossing with his head' over the gate, and Daniel was standing with the horse between him and the approaching train. There was nothing in the appearance of the horse to indicate to the motorman, if he had seen him, that he was the least bit frightened, or that there was any danger of him hurting himself or Daniel. It may have been, as said by the motorman, that the conductor signaled him with the air whistle, and the blast of the whistle testified to was merely an answer to the signal of the conductor. How that may be, we do not know, but there is nothing in the evidence that would justify the conclusion that the mortorman was negligent in blowing the whistle at that particular time and place. The Supreme Court of South Dakota, in the case of Lyons v. C., M. & St. P. Ry. Co. (S. D.) 132 N. W.) 679, in a case very similar to the case at bar, first held the railroad company liable under circumstances very similar to those in this case, but on petition for rehearing they overruled their former decision, and, after a very carefully prepared opinion, reversed the case on the bround that there was no evidence that the engineer was negligent in blowing the whistle at the time he did. In this case, it was claimed by the plaintiff, who was a woman, that the whistle was negligently blown and frightened her horse and caused it to run away and injure her. The court, in its opinion says:

"It conclusively appears that the engineer did not and could not have seen the plaintiff's team before the whistle was blown. The plaintiff herself says: 'The engine had not got beyond our team when it whistled. It had not got to it   Our team was a little easterly of the engine, just a little ways. It seems we were almost to the engine. We could look right at the engine. The engine whistled just before we got opposite to it. It was not as far as across this room, sideways of the room. * * * I saw two men in the cab and one of them looking out of the window, on the left hand or northerly side of the engine, going east.' The engineer, who was on the right side of the cab, says: 'I did not see the plaintiff in this case or the team or any team before I whistled in the cut. * * * My attention was not called by any officers of the road to the accident the next day or next day but one after the accident. The fireman spoke something about some team being scared at the time, but I did not see it.' He could not have known that the plaintiff's horses were, or were likely to be, frightened otherwise than through information derived from the fireman. Both the plaintiff and her son stated positively there were no indications of fright until the whistle was blown. The fireman could not have discovered indications of danger before they existed, even if he saw the team before the whistle was blown. All that is material to this phase of the case must have transpired almost, if not, instantaneously. Hence the conclusion is irresistible that the engineer was not aware of any danger to the plaintiff before the whistle was blown and the mischief accomplished. Upon more mature reflection, the court is satisfied it gave undue effect in its former decision to the statement of the engineer that 'the fireman spoke something about some team being scared at the time.' The fireman would not speak of a team being scared before it was in fact scared.

"The plaintiff's cause of action rests on the hypothesis, and her evidence conclusively shows that the team was not scared before the whistle was blown. Clearly, then, the evidence disclosed by the record on this appeal does not justify the conclusion that the engineer was aware of the plaintiff's danger in time to have avoided it by not blowing the whistle for the private crossings, and it is unnecessary to determine what his conduct should have been if he had been aware of such danger. The motion for a directed verdict should have been sustained."

We could multiply the authorities on this proposition but deem the authorities here cited sufficient to show that, in our opinion, the railroad company in this case is not liable.

Counsel for plaintiff in error has argued that certain instructions requested by the plaintiff should have been given, and that a number of the instructions given by the court should not have been given, but the record shows that proper exceptions were not saved to these alleged errors and we will not notice them further than to say that in our opinion there were entirely too many in-

structions given, and that they tended to confuse the jury rather than assist it. The court should prepare as few pointed instructions as will present the question of law, and not repeat the same principle and reiterate in different language to try to convey to the jury what they mean by the instructions. The jury, as a general thing, have intelligence and education enough to understand the English language, and if the instructions clearly state the proposition of law, the juries are capable of taking care of themselves.

Most of the cases cited by counsel for defendant in error are cases where the engineer saw the person injured, and saw the horses that were frightened, and continued to whistle, apparently unnecessarily, after seeing the danger that the party was in. No such condition prevails in this case, as the motorman did not see Daniel or his horse, and knew nothing of him being frightened until they heard of it some days later.

After a thorough examination of the record in this case, and a careful review of the brief filed, we have reached the conclusion that the judgment of the court below should be reversed, and the case remanded for another trial, to be conducted in accordance with the views herein expressed.

By the Court: It is so ordered.